NOTE:  This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

_____

**IN RE:  HUBBELL INCORPORATED,**
*Appellant*

_____

2015-1222

_____

Appeal from the United States Patent and Trademark Office, Patent Trial and Appeal Board in No. 90/012,086.

_____

Decided:  April 7, 2016

_____

WILLIAM EUGENE BRADLEY, Michael Best Friedrich, Washington, DC, for appellant.

THOMAS W. KRAUSE, Office of the Solicitor, United States Patent and Trademark Office, Alexandria, VA, for appellee Michelle K. Lee. Also represented by MICHAEL SUMNER FORMAN, JEREMIAH HELM.

_____

Before DYK, PLAGER, and TARANTO, *Circuit Judges.*

PER CURIAM.

Hubbell Incorporated owns U.S. Patent No. 7,323,639, which describes and claims certain adaptable weatherproof covers for electrical outlets and methods of installing such covers.  In an ex parte reexamination of the

'639 patent, an examiner determined that the products and methods of claims 1–23 would have been obvious over various combinations of the prior-art references Hayduke, Berlin, Hartmann, and Shotey, and the Patent Trial and Appeal Board affirmed the examiner's rejections on appeal and rehearing. *Ex parte Hubbell Inc.*, No. 2014-3866, 2014 WL 1398353 (PTAB Apr. 9, 2014) (*Hubbell*); *Ex parte Hubbell Inc.*, No. 2014-3866, 2014 WL 4640118 (PTAB Sept. 16, 2014) (*Rehearing Op.*). Hubbell appeals, arguing that each of Hayduke and Berlin teaches away from the combinations relied on by the Board, there is insufficient evidence of motivation to combine Hartmann and Berlin, and the Board failed to consider evidence of commercial success. We affirm.

## BACKGROUND

The '639 patent describes a "cover that may interchangeably and safely accommodate virtually all commonly encountered electrical devices used in conjunction with electrical device boxes." '639 patent, col. 2, lines 1–4. The "electrical device" is an outlet, light switch, etc., inside a box of the sort commonly recessed in or mounted on a wall. *Id.*, col. 1, lines 31–35. Figure 12 is illustrative:



Fig. 12

In Figure 12, the cover 100 includes a base plate 110 and an adapter plate 150. The base plate may use keyholes 170—which permit adjustments after partial insertion—for attachment to the electrical device (the latter, not shown, would be to the right of the cover in Figure 12). *Id.*, col. 7, lines 24–45. The adapter plate—which may fit just one device, *e.g.*, a two-plug outlet, or may be adaptable to fit different devices, *see id.*, col. 8, lines 8–63—may also include keyholes that extend fully through the adapter plate and align with the underlying keyholes in the base plate. *Id.*, col. 10, lines 37–41. Although not shown in Figure 12, the base plate may also include at least one removable hinge and an attached protective cover (which would go to the left in Figure 12). *Id.*, col. 13, lines 9–14.

Claim 1, which is representative in this appeal, reads:

1. An in-use weather protective electrical outlet cover for an electrical outlet comprising at least one socket face and at least one mounting screw aperture, the electrical outlet cover comprising:

a base assembly comprising an adapter coupled to a base;

wherein the adapter has at least one opening extending through the adapter, the at least one opening comprising a size large enough to receive the at least one socket face, the at least one opening configured to surround the at least one socket face when the base assembly is installed on the electrical outlet;

wherein the base assembly comprising at least one base hinge member on a side of the base assembly and at least one keyhole slot extending through the base assembly, the keyhole slot positioned to align with the at least one mounting screw aperture when the base assembly is installed on the electrical outlet; and

a protective cover comprising at least one cover hinge member configured for hinged attachment to the at least one base hinge member;

wherein *the at least one keyhole slot is accessible for selective adjustment of the base assembly after the base assembly is installed on the electrical outlet.*

*Id.*, col. 16, lines 30–52 (emphasis added).

Following submission of a request for ex parte reexamination of the '639 patent, an examiner identified substantial new questions of patentability based on combinations of various prior-art references. The examiner rejected claims 1–23 for obviousness, primarily based on the combination of Hayduke and Hartmann and, separately, Berlin and Hartmann.

U.S. Patent No. 6,133,531 to Hayduke et al. discloses a weatherproof outlet cover assembly for protecting an outdoor electrical outlet. Hayduke teaches a base plate that includes a keyhole slot, a protective cover attached by a hinge, and an adapter plate. Hayduke does not disclose holes in the adapter plate to make the underlying base-plate keyhole slots accessible after the adapter plate is installed. U.S. Patent No. 5,280,135 to Berlin et al. discloses a weatherproof protective outlet cover that includes a base plate and a protective housing attached via a hinge. Berlin does not teach a keyhole slot in the base plate but instead uses standardized screw holes to attach the base plate to the electrical device. U.S. Patent No. 1,557,526 to Hartmann describes a plate that attaches to an electrical outlet that includes a hook for supporting an electrical fixture. The plate includes a keyhole slot, and the hook, positioned in front of the keyhole slot, includes a hole to make the keyhole slot accessible

Hubbell appealed the rejection of claims 1–23 to the Board. With respect to the combination of Hayduke and

Hartmann, Hubbell argued that because neither reference discloses a keyhole slot that is accessible after installation, Hartmann does not provide motivation to modify Hayduke. Hubbell also asserted that Hayduke teaches away from including holes in the adapter plate, other than those exposing the outlet itself. For the combination of Berlin and Hartmann, Hubbell argued that because Hartmann does not disclose an accessible-after-installation keyhole, one of skill in the art would not have been motivated to substitute Berlin's round screw hole with a keyhole slot. Hubbell also presented evidence that products embodying the '639 patent have been commercially successful.

The Board affirmed the examiner's rejection of claims 1–23. Regarding the Hayduke and Hartmann combination, the Board first found that Hartmann discloses a keyhole slot accessible after installation. *Hubbell*, 2014 WL 1398353, at *5. The Board then adopted, *id.*, the examiner's rationale that one of skill in the art would have been motivated to combine Hayduke and Hartmann "to allow for aligning, tightening and loosening of the mounting screws after the base assembly is installed on the electrical socket," J.A. 471–72. The Board also determined that Hubbell did "not provide[] explicit evidence from Hayduke specifically discouraging or discrediting providing [] accessibility" to the keyhole slot. *Hubbell*, 2014 WL 1398353, at *6.

With respect to the Berlin and Hartmann combination, the Board agreed with the examiner that one of ordinary skill in the art would have been motivated to modify the screw hole in Berlin to use a keyhole slot of the sort taught by Hartmann. *Id.* at *9–10. The Board identified several reasons for such use of a keyhole slot in place of a screw hole: "to allow removal of the outlet cover without completely removing the mounting screws, aligning the socket faces of the outlet cover after installation, and allowing tightening of the outlet cover after installa-

tion." *Id.* at *9. "[G]iven the ease of installation and alignment provided by Hartmann's keyhole slots for outlet covers," the Board determined, one skilled in the art would have been motivated to make this modification to Berlin. *Id.*

The Board addressed Hubbell's evidence of commercial success and found it insufficiently tied to the asserted invention. *Id.* at *6–7. In particular, the Board noted that the products embodying the invention sold for an average price of less than half of the average price of the comparator product. *Id.* at *7. Because the commercial success "may have been reasonably attributable in part or in whole to its significantly lower price rather than to the unique characteristics of the claimed invention," the Board said that it was "unpersuaded that the sales figures for [allegedly patent-covered products] are due to the claimed invention rather than price or a myriad of other factors." *Id.*

Hubbell requested rehearing, arguing that the Board did not fully consider its teaching-away arguments. The Board granted the request in part, but it did not change the result. The Board explained further why it found that neither Hayduke nor Berlin teaches away from the proposed combinations with Hartmann. *Rehearing Op.*, 2014 WL 4640118, at *1–3.

Hubbell appeals under 35 U.S.C. § 141(b), challenging the Board's rejection of claims 1–23 for obviousness. We have jurisdiction under 28 U.S.C. § 1295(a)(4)(A).

## DISCUSSION

Whether a claimed invention would have been obvious is a question of law, based on factual determinations regarding the scope and content of the prior art, differences between the prior art and the claims at issue, the level of ordinary skill in the pertinent art, and any objective indicia of non-obviousness. *Randall Mfg. v. Rea*, 733

F.3d 1355, 1362 (Fed. Cir. 2013). We review the Board's compliance with the governing legal standards de novo and its underlying factual determinations for substantial evidence. *Id.*

Hubbell first challenges the Board's rejection of a number of claims for obviousness over Hayduke and Hartmann, treating claim 1 as representative. The only element of claim 1 that Hubbell argues is missing from Hayduke is a keyhole slot that is accessible after installation. And Hubbell does not dispute in this court that Hartmann discloses a base plate with a keyhole slot accessible after installation. Hubbell's argument is that one of ordinary skill in the art would not have modified Hayduke by adopting this feature of Hartmann to include the claim-required keyholes because Hayduke teaches away from keyhole slots that are not covered after installation. In particular, Hubbell points to a passage in Hayduke that reads: "The cover 10 of the present invention further preferably includes a pivotal wall plate insertable within the back body 40 *for preventing direct access to the box* which contains the outlets." '531 patent, col. 9, lines 64–67 (emphasis added). Hubbell suggests that this passage teaches away from adding holes in the adapter plate that would make the keyhole slot accessible after installation because such holes would not prevent direct access to the outlet box.

The Board did not err in determining that this statement in Hayduke does not teach away from making the keyhole slots of Hayduke accessible. The passage, which discusses a preferred embodiment, "does not teach away . . . [as] it merely expresses a general preference for an alternative invention but does not 'criticize, discredit, or otherwise discourage' investigation into the invention claimed." *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 567 F.3d 1314, 1327 (Fed. Cir. 2009). Hubbell does not identify any passage in Hayduke that explicitly discredits or discourages direct access to the outlet box, and

the cited statement does no more than articulate a preference for an adapter plate that prevents direct access. That stated preference is insufficient to teach away from the claimed invention. *See id.*; *In re Fulton*, 391 F.3d 1195, 1201 (Fed. Cir. 2004).

Moreover, to the extent that Hayduke aims to prevent any "substantial direct access" to the electrical box, substantial evidence supports the Board's finding that the combination of Hayduke and Hartmann would not be inconsistent with that goal. *Rehearing Op.*, 2014 WL 4640118, at *1. The Board found that "the heads of the mounting screws *block* direct access to the box." *Id.* (emphasis in original). "[T]he combination of Hayduke and Hartman[n] would not interfere with the function of [the adapter plate] in preventing direct access to the underlying electrical box containing the outlets because the screws would block any access through the openings" in the adapter plate. *Id.* at *2. The Board's interpretation of Hayduke and blocking access is reasonable, further supporting its rejection of Hubbell's teaching-away contention.

Hubbell also challenges the Board's rejection of numerous claims for obviousness over Berlin and Hartmann. Hubbell treats claim 1 as representative and asserts that Berlin teaches away from using keyhole slots. Berlin's weatherproof cover is fastened to an outlet box using threaded screws that pass through threaded screw holes in the base plate, and those "holes are sized and adapted to conform to the standards for electrical outlets and boxes." '135 patent, col. 4, lines 21–23. Hubbell suggests that this statement would have discouraged one from replacing screw holes with keyhole slots, which do not conform to size and location standards.

The Board properly found no teaching away and, more affirmatively, a motivation to adopt keyholes. Berlin's stated preference for standardized screw holes does not

disparage or discredit alternatives such that it teaches away from the claimed invention. *DePuy Spine*, 567 F.3d at 1327. And the Board properly determined that one of ordinary skill in the art would have been motivated to replace the screw holes with keyhole slots: "Hartmann's teaching of using keyhole slots to permit mounting the assembly of Berlin without the need to completely remove the requisite mounting screws is persuasive of a useful purpose for the modification." *Hubbell*, 2014 WL 1398353, at *10. Motivation may be found, in other words, in the Hartmann keyholes' enabling the Berlin cover to be installed, adjusted, and removed without complete withdrawal of the mounting screw.

Hubbell further contends that the Board erred in its consideration of the evidence of commercial success. We see no error. Hubbell submitted a declaration and sales figures from 2006–2012 that show that three allegedly patent-covered products outsold a product that does not embody the claimed invention. J.A. 618–25. But the Board found that the allegedly patent-covered products were in fact "priced significantly lower than" the product not covered by the patent. *Hubbell*, 2014 WL 1398353, at *7. In light of that evidence-supported finding, the Board determined that it could not find that the success of the allegedly patent-covered products was attributable to the claimed invention. The Board did not err in that determination or, therefore, in not finding a commercial-success basis for coming to a different conclusion about obviousness than the rest of the analysis warranted.

CONCLUSION

For the foregoing reasons, we affirm the Board's rejection of claims 1–23.

**AFFIRMED**